618 So.2d 390 (1993)
Wendy P. RODRIGUEZ, Wife and/or Santos Rodriguez
v.
LOUISIANA MEDICAL MUTUAL INSURANCE COMPANY, Dr. Mario Edward Serrano, Dr. James H. Lashley, and West Jefferson Medical Center, Inc.
No. 92-CC-3333.
Supreme Court of Louisiana.
May 24, 1993.
Dale E. Williams, Metairie, Gwendolyn M. LaNasa, New Orleans, for applicant.
Lisa A. Condrey, New Orleans, David J. Halpern, Metairie, Harold A. Thomas, New Orleans, for respondent.
CALOGERO, Chief Justice.[*]
We granted a Writ of Review in this case to determine whether the Patient's Compensation Fund and/or the Patient's Compensation Fund Oversight Board are exempt from having to post bond for a suspensive appeal.
L.S.A.-R.S. 40:1299.44(C)(6), within the medical malpractice statute, provides that "any judgment of the court fixing damages recoverable in any such contested proceeding shall be appealable pursuant to the rules governing appeals in any other civil court case tried by the court." And, generally, civil litigants who take a suspensive appeal are governed by the Code of Civil Procedure art. 2124, which requires that security be furnished for a suspensive appeal.[1] On the other hand, L.S.A.-R.S. 13:4581 exempts "state ... boards or commissions exercising public power and functions" *391 from posting any type of appeal bond.[2]
The question thus presented is, just what did the Legislature intend when, with both C.C.P. art. 2124 and R.S. 13:4581 in force, it passed the medical malpractice act, including its provision that judgments in medical malpractice cases are to be appealable like appeals in any other civil court case. At the very least, the answer to that question is unclear.
That being the case, and charged as we are to determine the applicable law and decide cases, we find that C.C.P. art. 2124 is the governing procedural provision. Consequently, defendant/relator must furnish security for a suspensive appeal just as any other litigant must "in any other civil court case."
This case stems from a medical malpractice suit in which the plaintiffs' child, Santos Rodriguez, suffered peripheral nerve injuries to his shoulder at birth. The defendant physician's malpractice insurer made a $100,000 payment in settlement of plaintiffs' claim against the physician. Thereafter, a trial was held against the Patient's Compensation Fund (hereinafter, the Fund) to determine if the plaintiffs were entitled to recover more than the $100,000. On July 9, 1992, a verdict was rendered in favor of plaintiffs in excess of $600,000. The award was reduced to $500,000 pursuant to R.S. 40:1299.42.[3] The $500,000 was then reduced by $100,000, the amount of the settlement with the physician, pursuant to R.S. 40:1299.42(B)(2).[4]
The Fund timely filed a motion for new trial, which was denied on October 15, 1992. Thereupon, the Fund moved for and obtained an order granting a suspensive appeal without the necessity of having to file an appeal bond, on the strength of R.S. 13:4581.[5] On October 29, 1992, the district court conducted a hearing to determine anew whether the Fund would be required to post a suspensive appeal bond. On November 4, 1992, the judge vacated his earlier order and ordered that the Fund file a suspensive appeal bond in accordance with C.C.P. art. 2124.
Thereafter, the Patient's Compensation Fund Oversight Board (hereinafter, the Board) sought supervisory writs from the Fifth Circuit Court of Appeal. The writ was denied on November 30, 1992, "on the showing made." The Board then sought, and we granted, this Writ of Review.
*392 The Board contends that the law is clear, that R.S. 13:4581, a statute which exempts state boards and commissions from having to furnish appeal bonds, is applicable. The Board contends that it is a state board or commission, and so is the Fund.[6]
In further support of their contention that the Legislature must have intended R.S. 13:4581 to apply, they point to R.S. 40:1299.44(A)(7) which calls for prorating funds among claimants should the Fund be near exhaustion.[7] They argue that if the Legislature placed these provisions in the statute, and they surely did, they must not have contemplated allowing the cost of suspensive appeal bonds or, alternatively, the need to pay judgments pending appeal before finality, to contribute to the exhaustion of the Fund on a "first come, first serve basis."
On the other hand, plaintiffs/respondents take the position that the Fund is not a state board or commission,[8] but that in all events, the intent of the Legislature is clear. They meant for the Fund to post a bond for a suspensive appeal, just as "in any other civil court case tried by the court."
We ultimately conclude that it does not matter whether the Fund or the Board are state boards, for we resolve the issue before us by deciding that the Legislature, by its inclusion of R.S. 40:1299.44(C)(6) in the medical malpractice statute, meant for C.C.P. art. 2124, not R.S. 13:4581, to apply to suspensive appeals by the Fund.
As a matter of historical fact, Sections 1 and 2 of C.C.P. art. 2124 are taken directly from article 575 of the 1870 Code of Practice. With the exception of several minor *393 revisions, the article has been passed on, essentially intact. Therefore, C.C.P. art. 2124 and its predecessor provision from the Code of Practice, has been the long standing general rule that requires a civil litigant to post security for a suspensive appeal.
R.S. 13:4581 has also been a part of our law. It was originally enacted in 1902 as Acts 1902, No. 173, Section 1. It has subsequently been reenacted with changes for clarity. It was enacted by the Legislature to exempt state boards and commissions exercising public power and functions from the general rule that bond be posted for suspensive appeals.
The Medical Malpractice Act, on the other hand, did not become part of our law until 1975 as Act 817 of that year, R.S. 40:1299.41, et seq. In the Act the Fund was created pursuant to R.S. 40:1299.44 as a fund made up of surcharges paid by private health care providers for the purpose of compensating those injured through medical malpractice.
The procedure under the Medical Malpractice Act is as follows: When a person wishes to assert a claim of malpractice against a health care provider who has qualified under the act, he/she must present her claim to a medical review panel and receive an opinion from the panel prior to filing suit,[9] unless the parties agree to waive this requirement.[10] Within five days after the panel has rendered its opinion, the panel chairman submits a copy of the panel's report to the Board.[11] The claimant may then proceed to file suit on the claim or settle it as to liability and/or damages with the health care provider.
The total amount recoverable for all malpractice claims for injuries to or death of a patient, excluding future medical expenses and related benefits shall not exceed five hundred thousand dollars plus interest and costs.[12] The qualified health care provider is not liable for an amount in excess of one hundred thousand dollars (plus interest thereon accruing after April 1, 1991) for all malpractice claims because of injuries to or death of any one patient.[13] Any amount awarded from a judgment, settlement or arbitration in excess of one hundred thousand dollars shall be paid from the Fund pursuant to the provisions of R.S. 40:1299.44(C).[14] Any judgment of the court fixing damages recoverable in any such contested proceeding shall be appealed "pursuant to the rules governing appeals in any other civil court case tried by the court."[15]
The potential adverse effect of the Medical Malpractice Act is that persons most grievously injured by medical negligence are subject to reduced quantum recovery as a consequence of the cap on damages. The purported corresponding advantage is the enhanced prospect of medical personnel staying in Louisiana with the result that medical care will be more available to the citizens of the state. In addition, those injured by medical malpractice will purportedly be better off in that there will be a solvent defendant from which to pursue compensation, at the least $100,000 from the health care provider and up to an additional $400,000 from the Fund. We note that in order to ensure that adequate money will be available in the Fund, provisions exist for adjusting the annual surcharge paid by qualified health care providers.[16]
The Legislature has thus created a special scheme of compensation for those injured by medical malpractice. In the process, the substantive caps and discreet procedures established by the Legislature were particularly detailed. It is in this context that we are called upon to determine specifically what the Legislature intended regarding whether or not the Fund must file a suspensive appeal bond.
According to our jurisprudence:

*394 [w]here a statute is ambiguous and susceptible of two constructions, the courts will give that construction which best comports with the principles of reason, justice, and convenience, for it is presumed that the legislature intended such exceptions to its language as would avoid its leading to injustice, oppression, or absurd consequences.
Freechou v. Thomas W. Hooley, Inc., 383 So.2d 337, 340 (La.1980). Furthermore, we must "apply the statute and [ ] interpret it in a manner which is consistent with logic and the presumed fair purpose and intention of the Legislature in passing it ..." Id.
Furthermore, this Court has consistently applied certain principles of statutory interpretation. One such principle is that a statute which is in derogation of common or natural rights is to be strictly construed and not extended beyond its obvious meaning. Monteville v. Terrebone Parish Consolidated Government, 567 So.2d 1097, 1100 (La.1990). A second principle is when a statute grants immunities or advantages to a special class against the general public, i.e., when the Legislature grants such rights, powers, privileges, immunities, or benefits against the general public, the claims of the grantee should be strictly construed. Id. at 1101.
Accordingly, the contentions of the Fund and Board in this case should be and will be strictly construed. It is our determination that the Legislature did not intend that the Medical Malpractice Act provide any more special privileges than those which are expressly provided. Absent express provisions to the contrary, and in light of R.S. 40:1299.44(C)(6) ("[a]ny judgment... shall be appealable pursuant to the rules governing appeals in any other civil court cases tried by the court."), the Fund (and the Board) are bound by the generally prevailing rules regarding appeals and security therefor, C.C.P. art. 2124.
The Fund is not exempt from posting a bond for a suspensive appeal. It is required, in this case, to pursue its suspensive appeal in accordance with C.C.P. art. 2124.

DECREE
For these reasons we find that the Patient's Compensation Fund and its Oversight Board are not exempt from posting a suspensive appeal bond. Rather, the Fund and the Board are to observe C.C.P. art. 2124 when taking a suspensive appeal. They must post the required security.
The judgment of the district court ordering the Patient's Compensation Fund and/or its Oversight Board to furnish an appeal bond, and the judgment of the court of appeal affirming that action are affirmed.
AFFIRMED.
LEMMON, J., concurs.
KIMBALL, J., joins in opinion and assigns concurring reasons.
HALL, J., dissents.
WATSON, J., dissents.
KIMBALL, Justice (concurring).
The intent of La.Rev.Stat. 13:4581 is to relieve those boards and commissions which are backed by the State's resources from the requirement of posting appeal bonds. In the instant case, the Patient's Compensation Fund and its Oversight Board are not backed by the resources of the State, but rather are wholly privately funded and susceptible of insolvency. Therefore, the Patient's Compensation Fund and its Oversight Board are not "State ... boards or commissions exercising public power and functions" within the contemplation of § 4581. For this reason, I respectfully concur in the result reached by the majority.
NOTES
[*] Ortique, J., not on panel. For the procedure employed in assigning cases after January 1, 1993, to rotating panels of seven justices, see State v. Barras, 615 So.2d 285 (La.1993).
[1] C.C.P. art. 2124 states:

A. No security is required for a devolutive appeal.
B. The security to be furnished for a suspensive appeal is determined in accordance with the following rules:
(1) When the judgment is for a sum of money, the amount of the security shall be equal to the amount of the judgment, including the interest allowed by the judgment to the date the security is furnished, exclusive of costs ...
[2] L.S.A.-R.S. 13:4581 states in its entirety:

State, parish and municipal boards or commissions exercising public power and functions shall not be required to furnish any appeal bond; or any other bond whatsoever in any judicial proceeding instituted by or brought against them.
[3] L.S.A.-R.S. 40:1299.42 addresses the limitation of recovery against qualified health care providers. It provides in pertinent part:

B. (1) The total amount recoverable for all malpractice claims for injuries to or death of a patient, exclusive of future medical care and related benefits as provided in R.S. 40:1299.43, shall not exceed five hundred thousand dollars plus interest and cost.
[4] L.S.A.-R.S. 40:1299.42(B)(1) states:

(B)(2) A health care provider qualified under this Part is not liable for an amount in excess of one hundred thousand dollars plus interest thereon accruing after April 1, 1991, for all malpractice claims because of injuries to or death of any one patient.
[5] The injury to the child occurred on May 18, 1989. Plaintiffs filed suit against the physician in July 1991. In the original suit, neither the Fund nor the Board were made parties defendant. It was only after the physician settled the claim on April 16, 1992 that the Fund and the Board became involved when plaintiffs proceeded against the Fund for excess damages after the settlement with the defendant physician for $100,000.

Thus, it is not clear whether the Fund or the Board filed the appeal. Plaintiffs' counsel, in her brief, states that the Fund sought the appeal. Defendants' attorneys in their brief claims that it was the Board which took the appeal. The Board did not exist at the time of the injury. In fact, it did not come into existence until October 1, 1990. However, the Board was in existence when the suit was filed by plaintiffs.
Be that as it may, as far as we can tell, the plaintiffs proceeded against the Fund for excess damages. After the award of damages by the jury, it was the Fund that appealed the award of damages. Thus, it is the Fund that is involved here, not the Board. The Board did not become involved in the action until the district court vacated his original order and ordered the Fund to post a suspensive appeal bond. At that time, the Board filed for writs with the Fifth Circuit Court of Appeal.
[6] The Board makes several arguments as to why R.S. 13:4581 should apply. First, the Board claims that the Fund and the Board are state boards, created by the Legislature. In addition, they are a state board because they are organized within the Office of the Governor with the members of the Board appointed by the governor and subject to Senate confirmation.

Second, they contend that the Board exercises public power and performs state functions when it acts in the capacity of the State's executive agent in carrying out the public policy of the State enunciated in Butler v. Flint Goodrich Hospital, 607 So.2d 517 (La.1992), rehearing denied, November 25, 1992. In Butler, we held that the statutory cap of $500,000 on general damages in medical malpractice actions against multiple defendants does not violate State or Federal Constitutions.
Third, they argue that simply because they act in the private sector should not affect their status as a public entity. They contend that many public boards and commissions perform in the same manner.
Fourth, they claim that the Board has been given de facto status as a state agency within the definition of state agency in R.S. 13:4581. They maintain that since the passage of the Medical Malpractice Act in 1975, the Fund has not been posting suspensive appeal bonds and has generally been accepted as a state agency through custom.
Fifth, they submit that their status as a state agency is supported by Felix v. St. Paul Fire & Marine Insurance Company, 477 So.2d 676 (La. 1985) in which this Court sanctioned a Writ of Mandamus directed to the PCFOB thereby affirming its status as a state agency. (We note that this is incorrect. At the time Felix was handed down the Board did not exist. At that time the Commissioner of Insurance was charged with administering the Fund and the writ of mandamus was issued against the Commissioner mandating that he expend the necessary funds. Id. at 682.)
Sixth, they claim that the Federal Courts have specifically found them to be state agencies. Medders v. General Health, Inc., 716 F.Supp. 232 (M.D.La.1989).
[7] According to R.S. 40:1299.44(A)(7)(a)-(d):

(7)(a) Claims from the patient's compensation fund exclusive of those provided for in R.S. 40:1299.43 shall be computed at the time the claim becomes final.
(b) A final claim shall be paid within fortyfive days of the boards's receipt of a certified copy of the settlement, judgment, or arbitration award, unless the fund is exhausted and the proration provision contained in Subparagraph (7)(c) applies.
(c) If the fund would be exhausted by payment in full of all final claims then the amount paid to each claimant shall be prorated.
(d) Any amounts due and unpaid shall be prorated.
[8] Plaintiffs argue that they filed suit for the excess damages against the Fund, not the Board. Furthermore, the Board did not exist until October 1990. Prior to that the Commissioner of Insurance administered the Fund. Moreover, R.S. 40:1299.44(A)(1) specifically states that the Fund consists of "private monies." Finally, the Fund is not a state agency but merely a fund created to collect the "private monies" for the purpose of paying claims to qualified claimants. In essence, it exercises no "public power or functions."
[9] L.S.A.-R.S. 40:1299.47(B).
[10] L.S.A.-R.S. 40:1299.47(B)(1)(c).
[11] L.S.A.-R.S. 40:1299.47(J).
[12] L.S.A.-R.S. 40:1299.42(B)(1).
[13] L.S.A.-R.S. 40:1299.42(B)(2).
[14] L.S.A.-R.S. 40:1299.42(B)(3)(a).
[15] L.S.A.-R.S. 40:1299.44(C)(6).
[16] L.S.A.-R.S. 40:1299.44A(2).